452 S.E.2d 50

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Robert Russell FARLEY, Defendant Below, Appellant.**

**No. 22139.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Nov. 18, 1994.

Mary B. McLaughlin, Asst. Atty. Gen., Charleston, for appellee.

Dana R. Shay, Fairmont, for appellant.

CLECKLEY, Justice:

■ The defendant, Robert Russell Farley, was convicted in February, 1993, by a jury in the Circuit Court of Marion County of two counts of first-degree arson, four counts of second-degree arson, one count of fourth-degree arson, and one count of falsely reporting an emergency incident. He was sentenced to serve from three to thirty years.[1] His primary assignment of error is the admission of his confession, which he contends was rendered involuntary by improper police conduct. We find no prejudicial error and affirm the convictions.

## I.

In September and October, 1991, several suspicious fires occurred in Mannington, West Virginia. Fires were set in Sandy's Yarn Shop, the Old Bank Building, Shawn's Playhouse, the Community Hardware, the Masonic Lodge, the East High Street Methodist Church, and two dwellings. An arson attempt was committed upon the Old Theater, also known as the Old Show Building.

On November 3, 1991, a false fire alarm was reported to 9–1–1. Chief of Police David L. James, who had known the defendant most of his life, identified the defendant as the caller. Thereafter, Chief James asked a number of suspects, including the defendant, if they would come to the police station for questioning and a polygraph test concerning the fires. On Monday, November 4, 1991, at approximately 3:00 p.m., the defendant went to the Mannington Police Department and met with Chief James and Robert Hall, an investigator for the State Fire Marshal's Office.

After being advised of his *Miranda* rights[2] by the officers present, the defendant stated that he understood his rights and signed a waiver form. The defendant was specifically informed that he was not under arrest and could leave at any time. At this time, a polygraph test was administered by Sergeant Ronald Lee Catlett.[3] Sergeant Catlett was the only person present in the room while the defendant took the test. At its conclusion, Sergeant Catlett left the room and reviewed the results with Mr. Hall and Chief James. These three men then questioned the defendant about the fires in the area. It was at this time that the defendant was informed that he did not do well on the polygraph test. At first, he denied involvement with the fires and the false fire alarm call; however, after the tape recording of the 9–1–1 call was played to the defendant, he admitted that he placed the call.

The defendant subsequently confessed to setting the fires at the Old Bank Building, the Masonic Lodge, the East High Street Methodist Church, and to the attempted arson at the Old Theater (Show) Building.[4] He

---

1. By order dated April 16, 1993, the defendant was sentenced for first-degree arson (Counts I and V of the indictment) to concurrent terms of not less than two nor more than twenty years, with credit for time previously served; for fourth-degree arson (Count VI), he was sentenced to not less than one nor more than two years to run concurrently; for second-degree arson (Count VII), he was sentenced to not less than one nor more than ten years to run consecutively; and for falsely reporting an emergency incident (Count VIII), he was sentenced to six months, to run concurrently.

The defendant contends that his convictions on Counts II, III, and IV violate our rule against multiplicity because these charges arose from the same fire as in Count I. However, the circuit court ordered only one sentence for Counts I, II, III, and IV. It is well established that an accused may be *found guilty* of all offenses arising out of one transaction, but may be *punished* only for separate offenses. *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

We find that the sentencing order rendered this issue moot.

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The polygraph test also was administered to three or four other individuals. The defendant was the only suspect who was questioned following the test.

4. A transcript was prepared from a portion of the tape-recorded interrogation. During the questioning, Chief James, with help from the defendant, prepared a written statement of the confession. The statement was read to the jury. It stated, in part:

"On September 27th, 1991, there were people up in the Bank Building on Market Street, the 106 address, upstairs second floor apartment. I waited until everyone was gone. At around 2:00 a.m. I entered the building. I found a

denied involvement with any other fire in the area.

When Deputy Mark E. Fetty from the Marion County Sheriff's Department arrived at the police department, the defendant was again advised of his *Miranda* rights. Immediately after Deputy Fetty began to question him, the defendant stated that he would not answer any further questions without an attorney. The. interrogation ceased, and the defendant was arrested and taken into custody.

On March 5, 1992, a hearing was held on the defendant's pretrial motion to suppress his confession. The defendant did not testify. Sergeant Catlett, Mr. Hall, Chief James, Officer Cross, and Deputy Fetty testified that the defendant was properly advised of his *Miranda* rights and that his statement was given voluntarily. The police contended that no promises of leniency were given in exchange for his confession. The circuit court, without elaboration, found that the defendant was properly advised of his rights and that the statement was "freely and voluntarily made," and was therefore admissible.

At trial, the defendant recanted his confession. He testified that he made the statement because the officers repeatedly questioned him, "kept on promising [him] things," and said "we'll get you help." However, on cross-examination, the defendant stated that he was not swayed by these offers.

Following his convictions, the circuit court denied the defendant's motion for judgment of acquittal and motion for a new trial. This appeal ensued.

## II.

The defendant assigns as error the admission of his oral and written confession, which he contends was rendered involuntary by improper police conduct. It is axiomatic in West Virginia jurisprudence that the prosecution must show by "affirmative evidence" as a condition precedent to its admissibility that the voluntariness of a confession is established by a preponderance of the evidence. *State v. Zaccario*, 100 W.Va. 36, 129 S.E. 763 (1925). A mere *prima facie* showing is insufficient. *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975). Once that decision is made, we accord the trial court's ruling appropriate weight. In Syllabus Point 2 of *State v. Stewart*, 180 W.Va. 173, 375 S.E.2d 805 (1988), we stated our standard of review in these matters:

" ' "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syllabus Point 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978).' Syl. pt. 7, *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985)."

Although we give deference to the factual findings of the trial court when the voluntariness of a confession is in issue, the ultimate determination of "voluntariness is a

---

lighted cigarette burning on the floor of the second floor. I placed the burning cigarette in the wiring of the electrical box so it would look like an electrical fire. I then went home and went to bed. I was awakened by Officer Cross at our door evacuating people from our building. I then watched the fire and felt sad for what I had done. I didn't mean to burn the other structures, just the Old Bank Building....

"On October 20th, 1991, at around 11:00 a.m. I went to the Show Building. The door was already ajar. I went in and checked. No one was inside. I saw a yellow bucket with rags in it and put a match to it in front of the electrical box so it would look like an electrical fire. But I knew it wouldn't burn because of the flame retardant fabric in [the] curtains. This was set for a joke. This wasn't to harm anyone or any other structures.

"At about 1:00 p.m. on the same date I went to the Masonic Building and walked through the open stairway door and went upstairs to the third floor bathroom in the hall and flipped a match in the wastebasket and walked away. I made sure that no one was in the building. I only meant to burn the building....

"On October 25th, 1991, at about 11:00 p.m., after I had been out walking for about an hour I found the door open on East High Methodist Church. I walked in and saw the door open to a small room, a Sunday School room. I entered the room. I saw a candle and I lit the candle and set it on the shelf so it would burn down and catch the shelf on fire. I then left the church knowing no one was in danger, only the church structure. I turned the lights on to find the candle because I went to church there for years."

legal question requiring independent [appellate] ... determination." *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302, 316 (1991).[5] To be specific, we hold that this Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the trial court applied the correct legal standard in making its determination. *See State v. Starr*, 158 W.Va. at 916, 216 S.E.2d at 249 ("trial court's discretion does not include applying an improper standard of proof").[6] The holdings of prior West Virginia cases suggesting deference in this area continues, but that deference is limited to factual findings as opposed to legal conclusions.

■■■■■ Whether police activity meets constitutional muster in any particular context depends on the facts which are unique to the situation. In this regard, the trial court has a superior sense of what actually transpired during the taking of a confession, by virtue of its ability to see and hear the witnesses who have firsthand knowledge of the events. Appellate oversight is therefore deferential, and we should review the trial court's findings of fact following a suppression hearing, including mixed fact/law findings, under the clearly erroneous standard. If the trial court makes no findings or applies the wrong legal standard, however, no deference attaches to such an application. Of course, if the trial court's findings of fact are not clearly erroneous and the correct legal standard is applied, its ulti-mate ruling will be affirmed as a matter of law.

■■■■■ No deference is required in this case because the trial court made no findings except to express its ultimate legal conclusion that the statement was "freely and voluntarily made" and was therefore admissible. Because the trial court failed to make specific factual findings, we must first decide whether it is necessary to remand this case for a new hearing to give the trial court an opportunity to offer to this Court and the parties the benefit of its in-court observations and evaluations. Where findings of fact and conclusions of law are not made as required by law, this Court has authority to remand for noncompliance. *See Commonwealth Tire Co. v. Tri-State Tire Co.*, 156 W.Va. 351, 193 S.E.2d 544 (1972); *Chandler v. Gore*, 170 W.Va. 709, 296 S.E.2d 350 (1982) (cases decided under W.Va.R.Civ.P. 52). Relevant factors to be considered in making this determination are the nature of the controversy, the extent of the conflict of testimony, the centrality of credibility to the issue to be decided, and the completeness of the transcript of the hearing below. After reviewing the transcript and carefully reviewing the briefs of the parties, we believe that any *conflict in testimony is minimal*, at least in the most crucial areas. The defendant did not testify at the hearing on the motion to suppress nor did he offer any other evidence other than the cross-examination of the police officers.[7] More significantly, the defen-

---

5. Justice O'Connor observed in *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 453, 88 L.Ed.2d 405, 415 (1985) (holding that the "voluntariness" of a confession is not a "factual issue," but is a "legal question meriting independent consideration in a federal habeas proceeding"): "[T]he hybrid quality of the voluntariness inquiry, subsuming, as it does, a 'complex of values,' *Blackburn v. Alabama*, 361 U.S. [199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 248 (1960) ], itself militates against treating the question as one of simple historical fact."

6. In other contexts, appellate courts using the "abuse of discretion" standard have suggested that the "deferential review ordinarily inherent in that standard is modified by a closer review when the appropriate criteria that are established ... are in question. *See Cooper v. Dyke*, 814 F.2d 941, 950 (4th Cir.1987) (abuse of discretion review appropriate if district court fol-lows proper standards); *Daly v. Hill*, 790 F.2d 1071, 1085 (4th Cir.1986) (abuse of discretion not applicable where district court applies incorrect criteria)." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174 (4th Cir.1994).

7. The defendant testified at trial regarding the confession, but he did not renew or otherwise request the trial court to revisit the suppression issue. *Thompson v. Steptoe*, 179 W.Va. 199, 366 S.E.2d 647 (1988) (where there is a change in circumstances, the trial court has discretion to reconsider a pretrial ruling on a motion to suppress). In order to preserve the issue for appellate review, a defendant is not required generally to renew a pretrial motion to suppress when relevant evidence is offered at trial. *See Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). It is another proposition, however, whether a defendant who does not re-

dant does not raise as an appellate issue the failure of the trial court to make findings. Rather, the defendant challenges the ruling of the trial court as a matter of law. Finally, we note that there is ample testimony to demonstrate the reliability of the confession, and the absence of the trial court's findings on this point is not considered fatal.[8] In circumstances where a trial court admits a confession without making specific findings as to the totality of the circumstances, the admission of the confession will nevertheless be upheld on appeal, but only if a reasonable review of the evidence clearly supports voluntariness. *See United States v. Carter,* 569 F.2d 801 (4th Cir.1977); *United States v. Lewis,* 528 F.2d 312 (4th Cir.1975).[9]

## A.

■ The defendant first contends that he invoked his right under *Miranda* to remain silent and the police officers did not honor that right as required by this Court's decisions.[10] The State, however, asserts that the

---

new the motion to suppress at trial can use the new and additional evidence offered at trial to appeal the trial judge's pretrial ruling. Some guidance on this issue is provided by an earlier decision of the United States Supreme Court in *Gouled v. United States,* 255 U.S. 298, 312–13, 41 S.Ct. 261, 266, 65 L.Ed. 647, 654 (1921):

"Where, in the progress of a trial, it becomes probable that there has been an unconstitutional seizure of papers, it is the duty of the trial court to entertain an objection to their admission or a motion for their exclusion *and to consider and decide the question as then presented, even where a motion to return the papers may have been denied before trial.*" (Emphasis added).

Under *Gouled,* the trial judge's duty "to consider and decide the question as then presented" is triggered only by a defendant's trial objection or motion. Because the defendant did not renew his motion to suppress at trial, specifically after he had testified, he is now foreclosed from using trial testimony to challenge the trial court's ruling. *See generally Wimer v. Hinkle,* 180 W.Va. 660, 379 S.E.2d 383 (1989).

8. Although "reliability [is] the linchpin in determining the admissibility' of evidence under a standard of fairness that is required by the Due Process Clause of the Fourteenth Amendment," *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372, 1380 (1994), we do not wish by mentioning it as a relevant factor to give it undue and disproportionate weight. The decisive factor in determining the admissibility of a confession is its voluntariness. All the interrogation rules—*Miranda,* the prompt presentment rule, and the due process/voluntariness test—emphasize fairness, free will, and the voluntary nature of the defendant's statement. Although reliability is not irrelevant, at least as a concern under Rule 403 of the West Virginia Rules of Evidence, *see Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (Constitution does not address the reliability issue independently of the voluntariness issue), it is not the primary consideration as in the identification context, where reliability and the possibility of misidentification is the major concern. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). Our constitutional rules in the confes-

sion area are designed to level the playing field by reducing, at least to some extent, the opportunity for coercion and overreaching, and to limit the use of out-of-court statements where this is detected.

9. Concededly, we have vacillated in prior cases regarding the duty of the trial court to make findings of fact and conclusions of law, but we have always strongly recommended it. *See State v. Gwinn,* 169 W.Va. 456, 288 S.E.2d 533 (1982); *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978). However, our most definitive decision has clearly stated that such findings and conclusions are necessary and mandatory. In *State v. Clark,* 171 W.Va. 74, 79, 297 S.E.2d 849, 854 (1982), we stated:

"Basing its decision on the preponderance standard, the trial court must make findings of fact and conclusions of law regarding the admissibility of the evidence. When credibility of the witnesses is determinative on the issue of whether to admit or exclude evidence, the trial court must clearly indicate why it chose to believe one witness more than another. Such findings and conclusions are necessary so that this Court may properly fulfill its appellate review obligations by ensuring that the state did or did not meet its burden of proof."

Of course, as we decide in this case, the failure to comply with the *Clark* mandate is not always fatal. When there are no specific findings, the standard of appellate review must necessarily be *de novo* and plenary. *See State v. Stotler,* 168 W.Va. 8, 282 S.E.2d 255 (1981) (this Court made its own findings where trial judge failed to do so).

10. There is a serious question whether the *Miranda* rights are even applicable in this case. *See State v. George,* 185 W.Va. 539, 408 S.E.2d 291 (1991) (*Miranda* rights are not triggered unless there is custody); *State v. Preece,* 181 W.Va. 633, 383 S.E.2d 815 (1989) (no *Miranda* warnings necessary unless a reasonable person in the suspect's position would have considered his or her freedom of movement curtailed to a degree associated with a formal arrest). The facts indicate that the defendant was not in custody while the

defendant's statement was voluntary and that the defendant made no request to terminate the interrogation or to otherwise assert the right to silence. Thus, we deal with the issues of whether the statement obtained after the suspect allegedly decided to remain silent is admissible and whether his right to cut off questioning was scrupulously honored.

In Syllabus Point 1 of *State v. Woodson*, 181 W.Va. 325, 382 S.E.2d 519 (1989), we stated that violation of these rights would render a statement inadmissible:

"'Once a person under interrogation has exercised the right to remain silent guaranteed by *W.Va. Const.*, art. III § 5, and *U.S. Const.* amend. V, the police must scrupulously honor that privilege. The failure to do so renders subsequent statements inadmissible at trial.' Syllabus Point 3, *State v. Rissler*, 165 W.Va. 640, 270 S.E.2d 778 (1980)."

The transcript of the tape-recorded confession shows that at one point during the questioning Mr. Hall asked the defendant if he was having difficulty talking about the fires. The defendant vaguely stated that he could not talk about them, but he did not otherwise indicate that he wanted the interrogation to end nor did he state that he did not want to answer any further questions. Therefore, we find that the defendant failed to invoked his right to remain silent. He merely expressed his reluctance to give specific and detailed information about the fires.

In an analogous situation, the United States Supreme Court addressed a suspect's ambiguous references to counsel in *Davis v. United States*, — U.S. —, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Reviewing its application of the *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) rule, the Supreme Court held that the rule comes into play only if a suspect "unambiguously" requests counsel. In *Davis*, although the suspect initially waived his *Miranda*

rights, about an hour and a half into the interview, he said: "Maybe I should talk to a lawyer." At this point, according to the uncontradicted testimony of the agents, "'[We m]ade it very clear that ... we weren't going to pursue the matter unless we have it clarified is he asking for a lawyer or is he just making a comment about a lawyer, and he said, ["]No, I'm not asking for a lawyer" and then he continued on, and said, "No, I don't want a lawyer."'" After a short break, the agents then reminded Davis of his *Miranda* rights and the interview continued for another hour—until Davis said, "'I think I want a lawyer before I say anything else.'" At this point, questioning ceased. — U.S. at —, 114 S.Ct. at 2353, 129 L.Ed.2d at 368–69.

In discussing the issue, the Supreme Court stated:

"The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning ... would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." [—] U.S. at [—], 114 S.Ct. at 2355–56, 129 L.Ed.2d at 372. (Citation omitted).

The Court acknowledged "that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." But, it said, "the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." — U.S. at —, 114 S.Ct. at 2356, 129 L.Ed.2d at 372.

interrogation took place. To the contrary, he was told by the police that he was free to leave at any time he chose to do so. Telling a suspect that he/she is not under arrest and is free to leave usually is sufficient to prevent a finding of custody and will circumvent a finding of *de facto* arrest. *See State v. Wyant*, 174 W.Va. 567, 328

S.E.2d 174 (1985); *State v. Stanley*, 168 W.Va. 294, 284 S.E.2d 367 (1981). Because neither the parties nor the trial court addressed this issue and because the defendant was actually advised of his *Miranda* rights at the time he was questioned, we too will assume that the full panoply of *Miranda* rights apply to this interrogation.

In a concurring opinion, four Justices expressed the view that the rule should be that "when a suspect under custodial interrogation makes an ambiguous statement that might reasonably be understood as expressing a wish that a lawyer be summoned (and questioning cease), interrogators' questions should be confined to verifying whether the individual meant to ask for a lawyer." —— U.S. at ——, 114 S.Ct. at 2364, 129 L.Ed.2d at 382. The majority observed that asking such clarifying questions would "often be good police practice," but made it clear that it was not required. —— U.S. at ——, 114 S.Ct. at 2357, 129 L.Ed.2d at 373.

Obviously, the situation *sub judice* is not controlled by *Edwards*. *See generally Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Rather, the defendant contends that the request here was to terminate the interrogation in its entirety and that request was not "scrupulously honored." Interestingly, the decisions of the United States Supreme Court suggest that a defendant who requests counsel has a stronger position than a defendant who merely asserts a right to silence, if he later gives statements in the course of further discussion with the police. *See Arizona v. Roberson*, 486 U.S. 675, 683, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704, 714 (1988) ("a suspect's decision to cut off questioning, unlike his request for counsel, does not raise the presumption that he is unable to proceed without a lawyer's advice").

We do not find it necessary to decide under our Constitution and laws whether the rights protected by *Edwards* are stronger than those supposedly invoked by the defendant.[11] It is clear, however, that the reasoning of *Davis* is more applicable to this case, and, in either context, we agree that "the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." —— U.S. at ——, 114 S.Ct. at 2356, 129 L.Ed.2d at 372.[12] We believe that under *Davis* insubstantial and trivial doubt, reasonably caused by the defendant's ambiguous statements as to whether he wants the interrogation to end, should be resolved in favor of the police and that under these circumstances further interrogation by the police does not offend the West Virginia Constitution. *See generally State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980). Therefore, as suggested by the Fourth Circuit in *United States v. Gordon*, 895 F.2d 932, 938 (4th Cir.1990), we hold that to assert the *Miranda* right to terminate police interrogation, the words or conduct must be explicitly clear that the suspect wishes to terminate all questioning and not merely a desire not to comment on or answer a particular question.

Furthermore, we conclude as the United States Supreme Court stated in *Mosley:* "This is not a case, therefore, where the police failed to honor a decision ... to cut off questioning, either by refusing to discontinue

**11.** The pragmatic difference between *Michigan v. Mosley, supra,* (assertion of the right to silence), and *Edwards v. Arizona, supra,* (request for a lawyer), is elusive and often difficult to understand. Despite some theoretical difference ("I don't want to talk about this case" versus "I don't want to deal with the police except with the help of a lawyer"), it is doubtful that most criminal defendants are thinking in these terms. Some are savvy enough to effectively assert their rights, but many are not educated or sophisticated enough to deal with police-initiated interrogation irrespective of the *Miranda* warnings. Many forms of hesitation indicating either an unwillingness to incriminate one's self or a desire to speak with a lawyer are, in reality, an assertion of rights vindicated by the *Miranda* decision.

**12.** By using *Davis, supra,* as an analytical starting point, we do not mean to imply that we are adopting *Davis* as part of West Virginia's jurisprudence. As stated in note 8, *supra,* the pri-

mary purpose of our interrogation rules is to level the playing field, to some extent, for the criminal defendant faced with custodial interrogation. Given the coercive atmosphere, police pressure, secrecy, and the lack of sophistication of many criminal defendants, it would seem that an expression of reluctance to cooperate, at least insofar as it relates to an expression of an interest in the assistance of a lawyer, ought to be honored by the police. An approach, more consistent with *Miranda* itself, would be to follow the practice approved by a number of lower courts and, as urged by the concurring opinion in *Davis,* to require the interrogating officers to ask clarifying questions in order to clear up any ambiguity surrounding an interest in speaking with a lawyer. We note with interest that it took the Hawaii Supreme Court only three months to reject *Davis* in favor of the more reasonable stop-and-clarify approach. *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994).

the interrogation upon request or by persisting in repeated efforts to wear down ... [the suspect's] resistance and make him change his mind." 423 U.S. at 105–06, 96 S.Ct. at 327, 46 L.Ed.2d at 322.

## B.

■ The defendant next contends that the police used deceptive practices in obtaining his confession. Specifically, he argues that he was informed that he did not do well on the polygraph test. The problem with the defendant's factual showing on this point is that there is no evidence in the record showing the results of the polygraph. In fact, the specific results of the test were not shown or given to the defendant at the time of the interrogation. Although of questionable relevancy, the defendant states that he was not informed that the results of the test could not be used at trial. Even if we assumed that the results of the polygraph were misrepresented to the defendant, this misrepresentation standing alone would be insufficient to render the confession involuntary.[13]

■ In *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706 (1988), we stated that misrepresentations made by police do not automatically render a confession inadmissible. Syllabus Point 6 of *Worley* states:

"Misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability."[14]

■ Because the defendant has failed to make any showing that there was in fact a misrepresentation, our discussion of this issue is brief. We find it significant that the defendant failed to show any causal connection between alleged misrepresentation and the confession. The record clearly demonstrates that the defendant did not confess upon hearing that he had performed poorly on the polygraph. Rather, it was the 9–1–1 tape, not the polygraph results, that sparked his confession. Confronting the defendant with a fact that may affect his trial "does not make his confession inadmissible." *State v. Sparks*, 171 W.Va. 320, 327, 298 S.E.2d 857, 864 (1982) (statement of brother who implicated the defendant in crime); *State v. Goldizen*, 93 W.Va. 328, 116 S.E. 687 (1923) (accomplice's statement threw blame on defendant).

Moreover, the evidence indicates that the confession was reliable. Mr. James testified that the attempted arson at the Old Theater was not public knowledge. Also, the defendant detailed the times, dates, and manner in which the fires were set. For instance, he knew that the curtains in the Old Theater were flame retardant. This evidence was corroborated by the fire marshal investigator.

## C.

■ The thrust of the defendant's involuntariness claim is that his confession was the product of impermissible promises used to foment the hope of favorable treatment and, therefore, the confession was involuntary *per se*. He relies on the Syllabus of *State v. Parsons*, 108 W.Va. 705, 152 S.E. 745

13. We do not believe that merely telling the defendant that he did not do well on a polygraph examination without further elaboration is likely to encourage an innocent person to confess. Had the police intentionally fabricated more *specific* false results to obtain a confession, our view may very well be different. This is particularly true if the police had reduced these fabrications to a written report and disclosed it to the defendant. We definitely draw a demarcating line between police deception generally, which does not render a confession involuntary *per se*, and the manufacturing of false documents by the police which "has no place in our criminal justice system." *State v. Cayward*, 552 So.2d 971, 974 (Fla.App.1989). In *Cayward*, the District Court of Appeals stated:

"We think ... that both the suspect's and the public's expectations concerning the built-in adversariness of police interrogations do not encompass the notion that the police will knowingly fabricate tangible documentation or physical evidence against an individual.... [T]he manufacturing of false documents by police officials offends our traditional notions of due process.... [M]anufactured documents have the potential of indefinite life and the facial appearance of authenticity." 552 So.2d at 974.

14. In *Worley*, applying the "totality of circumstances" test, we found a confession voluntary even though the police allegedly misrepresented to the defendant that his accomplice had confessed.

(1930): "When the representations of one in authority are calculated to foment hope or despair in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed voluntary." In *Parsons*, we relied upon the standard enunciated by the United States Supreme Court in *Bram v. United States*, 168 U.S. 532, 543, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897)[15]:

> "A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

However, as the Supreme Court recognized in *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302, 315 (1991), this is no longer the law. "[T]his passage from *Bram* . . . under current precedent does not state the standard for determining the voluntariness of a confession[.]" The appropriate analysis to determine a confession's voluntariness is the "totality of the circumstances" test. 499 U.S. at 286, 111 S.Ct. at 1252, 113 L.Ed.2d at 315.

Accordingly, we adopt the foregoing standard, and now hold that representations or promises made to a defendant by one in authority do not necessarily invalidate a subsequent confession. In determining the voluntariness of a confession, the trial court must assess the totality of all the surrounding circumstances. No one factor is determinative. To the extent that *Parsons* is inconsistent with this standard, it is overruled.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 863 (1973), the Supreme Court explained the application of this standard:

> "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g., Haley v. Ohio*, 332

U.S. 596, [68 S.Ct. 302, 92 L.Ed. 224 (1948)]; his lack of education, *e.g., Payne v. Arkansas*, 356 U.S. 560, [78 S.Ct. 844, 2 L.Ed.2d 975 (1958)]; or his low intelligence, *e.g., Fikes v. Alabama*, 352 U.S. 191, [77 S.Ct. 281, 1 L.Ed.2d 246 (1957)]; the lack of any advice to the accused of his constitutional rights, *e.g., Davis v. North Carolina*, 384 U.S. 737, [86 S.Ct. 1761, 16 L.Ed.2d 895 (1966)]; the length of detention, *e.g., Chambers v. Florida, supra* [309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940)]; the repeated and prolonged nature of the questioning, *e.g., Ashcraft v. Tennessee*, 322 U.S. 143, [64 S.Ct. 921, 88 L.Ed. 1192 (1944)]; and the use of physical punishment such as the deprivation of food or sleep, *e.g., Reck v. Pate*, 367 U.S. 433, [81 S.Ct. 1541, 6 L.Ed.2d 948 (1961)]. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut, supra* [367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)]."

When we examine the totality of the surrounding circumstances of the confession in this case, we find that the confession was given voluntarily. The defendant was a thirty-eight-year-old man who operated a game room in Mannington, previously owned a restaurant, and had worked in the coal mines. He went to the police department voluntarily, and his confession began a little over one hour after his arrival. He was properly advised of his *Miranda* rights and no physical punishment took place.

The transcript of the interrogation does reveal that the officers wanted to "help" the defendant. However, this suggestion of help does not meet the threshold that is necessary to establish unlawful inducement as we discussed in *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976). In *Casdorph*, we stated that the fact that after the defendant had waived his right to remain silent, a police officer was friendly, encouraged the defendant to confess, and promised in vague terms that he would help the defendant, without

---

**15.** *Bram* quoted 3 Russell on Crimes 478 (6th   American Ed.1850).

making any specific promises or threats, did not render the defendant's confession involuntary.

■ In the case at bar, the officers testified that they were referring to psychiatric treatment, not legal help.[16] Certainly, no specific promises of leniency were made in exchange for a confession. Reviewing the record as a whole, we are satisfied that no representations "calculated to foment hope or despair" in the mind of the defendant, nor any promise or threats were made to induce a confession. *See State v. Sparks, supra.*

■ The defendant finally argues that after he confessed to two of the fires, Mr. Hall pressured him into confessing to the other two by insinuating that by doing so his case would be presented to the court in a more favorable light.[17] The evidence shows that Mr. Hall did tell the defendant that he believed he committed more than two arsons. He urged him to be completely truthful and to provide the details of the other fires. Undoubtedly, Mr. Hall's questions were assertive. However, that is the nature of police interrogation.[18] A claim of coercion and involuntariness must be objectively reasonable and must be rooted in specific, concrete facts. We do not find that Mr. Hall's questions were overly suggestive or coercive. Furthermore, we are not persuaded that the defendant's freewill was overborne. In his trial testimony, the defendant conceded on cross-examination that he was not swayed by these comments and offers of the police.

For all the foregoing reasons, the judgment of the Circuit Court of Marion County is affirmed.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

16. We are indeed troubled by some of the comments made by the police during the interrogation. Police expressions of sympathy or compassion are certainly not prohibited. These expressions, like adjurations to tell the truth, are not likely by themselves to cause an innocent defendant to provide a confession. On the other hand, "any statement which is intended to imply or may reasonably be understood as implying that the suspect will not be prosecuted or punished" is absolutely forbidden. *See* Phillip Johnson, *A Statutory Replacement for the Miranda Doctrine,* 24 Am.Crim.L.Rev. 303, 305 (1987). The police in this case came perilously close to that line. A closer example of crossing the line is when the police emphasized that it was appropriate for mentally disturbed murderers to receive "good medical help" rather than punishment. Certainly, the defendant could only believe that he has been promised civil commitment as opposed to jail. *Cf. Miller v. Fenton,* 796 F.2d 598 (3rd Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986) (The panel of the Third Circuit actually concluded, 2–1, that the defendant's confession was voluntary based upon the facts stated above). In the case at bar, we believe from the totality of the circumstances that a reasonable person would not have concluded that police offers to help were tantamount to a promise of no criminal prosecution or imprisonment.

17. The transcript of the defendant's statement reflects the following exchange:

"MR. HALL: You're either completely truthful with me or you're not truthful with me at all, and that's how I'll make my decision. In terms of the fires that you set I stand prepared to prove two of them. I know that you're responsible for more than those and the whole package of the thing shows a pattern, okay, an erratic pattern of somebody crying out for help. Therefore, it's important to you.
"MR. FARLEY: I said I lit the fire, that I set the first one.
"MR. HALL: Okay. But you did more than that. Robert, you don't, apparently, you weren't hearing me before. I know the fear that's in you right now. I know the anxiety that's in you. But the point is that in order for me to be able to show what, in fact, occurred, and it *is something that was beyond your control,* I'm going to have to show the full and total, and complete picture. You can't just walk in and say, okay, I did one, but I didn't do any of the others because I know differently and you know differently.
"MR. FARLEY: Right, I—
"MR. HALL: Please, please be truthful."

18. We reject any view which would directly or indirectly suggest that it is improper for police to persuade a suspect to confess and there is nothing in our laws to the contrary. Police are permitted in this context to take legal advantage of the vulnerability of particular criminal suspects.