735 S.E.2d 565

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Jeffrey R. FINLEY, Defendant Below, Petitioner.**

No. 11–0622.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 2012.

Decided Oct. 19, 2012.

Mark Hobbs, Esq., Charleston, WV, for Petitioner.

Darrell V. McGraw, Jr., Attorney General, Benjamin F. Yancy, III, Esq., Assistant At-torney General, Charleston, WV, for Respondent.

PER CURIAM:

On April 16, 2010, a jury in the Circuit Court of Logan County convicted the defendant, Jeffrey R. Finley, of the first degree murder of his wife, with a finding that a firearm had been used in the commission of the murder. The circuit court then sentenced the defendant to life imprisonment without the possibility of parole. On appeal, the defendant argues that the trial court committed reversible error when it permitted the State to introduce a third statement made by him to investigators—a statement in which he confessed to killing his wife. For the reasons discussed herein, we find no error and affirm the defendant's conviction and sentence.

## I.  *Factual Background*

In the early morning of August 11, 2008, the defendant went to the Logan Detachment of the West Virginia State Police and reported that his wife was missing. After making the report, the defendant told the officers that he was going to go and look for his wife. Later that morning, the body of the defendant's wife was discovered in her parked car. The State Police began an investigation into the death.[1] Shortly after noon, investigators asked the defendant if they could interview him about his wife's death. The defendant agreed, and returned to the Logan Detachment where he met with the investigating officers. At the beginning of the interview, which was recorded, the defendant was read his "*Miranda* Rights" from a prepared form. In addition to his rights, this form notified the defendant that the interview was part of the investigation into his wife's death. The form further stated "[y]ou are *not* under arrest and are free to leave at any time." Emphasis in original. The defendant wrote his initials on the form beside each listed *Miranda* right, and beside the notice that he was not under arrest and was free to leave. The final section of the form, captioned "Waiver of Rights", was

---

1. Autopsy findings later affirmed what was apparent at the crime scene: the defendant's wife had been shot in the back of the head and her body had "numerous scrapes, bruises and opened wounds … due to blunt force trauma."

signed by the defendant and witnessed by two law enforcement officers. In this waiver the defendant acknowledged that

I have had this statement and my rights read to me. I understand them; I do not want a lawyer at this time; I understand and know what I am doing; no promises or threats have been made to me; and no pressure or coercion of any kind has been used against me in connection with this interview. I agree to be interviewed and answer questions and make a statement.

Over the course of the next four hours, including breaks, the defendant gave three statements.

The first statement lasted one hour and forty-eight minutes. In that statement the defendant denied any wrongdoing in the death of his wife, and instead attempted to implicate his seventeen-year-old stepdaughter as having murdered her. After making this statement the defendant was told he was free to leave; however, the defendant did not leave. Instead, the defendant told one of the investigators that he would like to speak with him again. The investigator agreed to another interview, but told the defendant that he wanted first to interview his stepdaughter. The defendant then went to the lobby area and waited.

Investigators then interviewed the stepdaughter, who was told that the defendant had "fingered" her as her mother's killer. The stepdaughter denied killing her mother, and said that following a day of "nitpicking" between the defendant and her mother, the defendant became very agitated, and at some point went to their bedroom where he shot and killed her mother. Afterwards, the defendant forced her to help dispose of her mother's body by threatening both her and her six-year-old brother. While her brother remained with the defendant, the stepdaughter said that she drove her mother's body to Harts Creek Road, where it was later found. Returning home, the defendant then told her that her mother's employer, Wal–Mart, would soon call because she would not show up for work, and that she was to tell them that her mother had left for work as normal. Wal–Mart did call, and the stepdaughter did as she had been instructed. It was after this telephone call that the defendant went to the State Police detachment to report her mother as missing.

After concluding the stepdaughter's interview, investigators told the defendant, who was still at the Detachment, they could again speak with him. This interview lasted approximately two minutes, ending when the defendant requested to have a lawyer present to assist him:

**Trooper R. Frye:** Today's date is August 11, 2008; time is 4:48 by my watch. Present at the Logan Detachment, uh, in the room is myself, Trooper Frye, Sergeant Brown and Jeff Finley. Um, Jeff, before we go any farther with this we had a conversation earlier where you was under Miranda is that true?

**Defendant:** Yes.

**Trooper R. Frye:** Uh, you're free to roam about, do what you want to after that interv … after that conversation ended, uh, you may have gotten something to eat, I don't know what you did but you were free to leave after that conversation. Is that correct?

**Defendant:** Right.

**Trooper R. Frye:** And uh, you understand we're here still speaking about the death of Lynn Finley.

**Defendant:** Yeah.

**Trooper R. Frye:** Which is your wife, and uh, you're still under Miranda warning. Do you understand that?

**Defendant:** Well, I'm going to ask a question.

**Trooper R. Frye:** Okay.

**Defendant:** Would it be smart for me to have a lawyer present?

**Trooper R. Frye:** That's up to you. I mean you can do that, that is your option. You can do whatever you want to do.

**Defendant:** Because I mean if I'm going to be truthful then I want a lawyer present and I'll state the whole truth.

**Trooper R. Frye:** You can do whatever you want to do on, on that aspect, uh, you're more than welcome to have a lawyer preset, um, but uh, there's some things that, on your prior statement that uh, that

you made that may not, may not have been truthful. But it is your right to have a lawyer and if you wish to have a lawyer we'll, we'll terminate the interview at this time.

**Defendant:** I want, I want a lawyer present.

**Trooper R. Frye:** Okay.

**Defendant:** That way I can be truthful an....

**Trooper R. Frye:** Alright. Concluding this interview, same date, the time is now 4:50 p.m.

After turning off the tape, and as they were leaving the room, the defendant asked "What happens now?" to which one of the investigator's told the defendant that they would continue the investigation, but that he was not under arrest and was free to leave. The defendant then asked "Well, what are you going to do?" to which the investigator again stated "We've got to keep the investigation going; you can leave." The defendant then asked "Well, can I talk to you?" The defendant was reminded that he had asked for a lawyer, to which the defendant then stated "Well, I changed my mind; I want to talk to you."

After discussing it between themselves, the officers decided that they could talk with the defendant again since he had changed his mind. This third interview lasted from 4:54 p.m. to 5:03 p.m. At the beginning of this interview, the following colloquy took place between the defendant and investigators:

**Trooper R. Frye:** Today's date is still August 11, 2008; the time now is 4:54 pm. Present in the room is myself [sic], Trooper Frye, Sergeant Brown, Sergeant Frye, and Jeff Finley, um, Jeff we was going to talk just now and uh, uh, I advised you was still under your Miranda warning. You, you agreed you understood that and um, you have since changed your mind about having a lawyer present while giving a statement. Is that correct?

**Defendant:** Yes.

**Trooper R. Frye:** Um, so you do not want a lawyer present you wish to speak with us, is that true?

**Defendant:** Yes.

**Trooper R. Frye:** No promises of any kind had been made to ya, uh ...

**Sgt. Brown:** No threats? Nobody's threatened you ...

**Trooper R. Frye:** No threats, we're just shootin' straight.

**Defendant:** Shootin' straight.

**Trooper R. Frye:** An[d], trying to find out what happened to your wife. Is that true?

**Defendant:** It's true.

**Trooper R. Frye:** Um, alright, if, if you want to just go ahead and tell us what happened startin' from uh, when ya'll got home from Ohio until today.

In the eight-to-nine minute period following this colloquy the defendant confessed to shooting and killing his wife. At the end of the interview, the defendant was again asked about his understanding that he could have a lawyer present during the interview:

**Sgt. Brown:** ... you decided to give this statement over your own free will?

**Defendant:** Yes, and more.

**Sgt. Brown:** And you understood that you could have a lawyer present with you?

**Defendant:** Yes.

Following the interview, the defendant was arrested and charged with his wife's murder.

Prior to trial, the defendant moved to suppress his statements, arguing with particularity that the third statement should not be admissible because he had requested the assistance of counsel prior to making it. Following a hearing, and briefing by the parties, the trial court found that

the police officers made no promises or threats or used any coercive tactics to obtain the defendant's statements; that the statements given, including the third statement after the right to counsel was asserted and then withdrawn were voluntarily given, and properly and timely disclosed by the police officers. The [trial court] specifically finds that the defendant initiated the further discussions immediately after the second statement was concluded and that based upon the totality of the circumstances, the defendant, made a knowing and intelligent waiver of the right to counsel and other rights in regard to all

the evidence and the statements. The [trial court] finds by a preponderance of the evidence ... that the three statements of the defendant ... are admissible in the State's main case in chief.

In his petition for appeal, the defendant states that he does not contest the trial court's findings regarding the first two statements. Instead, he assigns as error the admission of his third statement which he argues was not voluntary because he had requested the assistance of counsel, and because—during the four minute interval between the second and third statements—he and "his kid" were threatened.

## II. *Standard of Review*

■ In Syllabus Point 2 of *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994), we held that

This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.

With this standard as our guide, we review the record before us.

## III. *Discussion*

■ The defendant argues that he invoked his right to counsel at the conclusion of his second statement to police, and therefore that his third statement—given four minutes later—was inadmissible. In response, the State argues that the defendant voluntarily recanted his request for the assistance of counsel, and reinitiated communication with investigators before they could even leave the interview room. We find no error.

In *State v. Bradshaw*, 193 W.Va. 519, 530, 457 S.E.2d 456, 467 (1995), Justice Cleckley,

writing for the Court, explained that "the *Miranda* right to counsel has no applicability outside the context of custodial interrogation," that "until the defendant [is] taken into custody, any effort on his part to invoke his *Miranda* rights [is], legally speaking, an empty gesture" and that "the 'window of opportunity' for the assertion of *Miranda* rights comes into existence only when that right is available." *Id.*

The defendant apparently argues the *Miranda* right to counsel attaches when *Miranda* warnings are given irrespective of whether he is in custody. Some support for this position may be gleaned from note 10 in *State v. Farley*, 192 W.Va. at 252, 452 S.E.2d at 57, and note 3 in *State v. Jones*, 193 W.Va. 378, 381, 456 S.E.2d 459, 462 (1995). These cases were intended to suggest under special circumstances that *Mirandizing* a defendant could create a situation where the failure to honor those rights could create such a state of confusion that a defendant might reasonably believe even his right to leave has been changed. See *United States v. Obasa*, 15 F.3d 603 (6th Cir.1994) (*Miranda* warnings are necessary only prior to custodial interrogation; the issuance of *Miranda* warnings may transform a legal *Terry* stop into an illegal arrest). Absent these unique circumstances, which obviously are not present here, we believe the great weight of authority in this country is that a suspect may not invoke his *Miranda* right to counsel outside the context of custodial interrogation.

*Id.,* 193 W.Va. at 530 n. 9, 457 S.E.2d at 467 n. 9.

To clarify our law on this issue, we held in Syllabus Point 3 of *Bradshaw*, that "[t]o the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." [2]

---

2. Justice Cleckley further explained that

As the Supreme Court recognized in *Rhode Island v. Innis* [446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)], "[i]t is clear ... the special procedural safeguards outlined in *Miranda* are required not where a suspect is

simply taken into custody, but rather where a suspect in custody is subjected to interrogation." We believe the same reasoning applies where a defendant is being interrogated, but he is not in custody. The "inherent compulsion" that is brought about by the combination

There is no evidence in the record that a reasonable person in the defendant's position would have considered his freedom of action curtailed to a degree associated with a formal arrest.[3] To the contrary, the record shows that the defendant was told, on several instances, that he was free to leave, including at the conclusion of the second statement following his request for the assistance of counsel. The defendant was under no inherent compulsion to speak with police, and could have left the police detachment at any time.

Reviewing the record before us, and applying the totality of the circumstances analysis discussed in *State v. Farley* and *State v. Middleton, supra*, we find that the defendant's third statement was voluntarily given and that the trial court did not err in admitting it into evidence. The defendant has a high school degree, presented no evidence of diminished mental capacity, or evidence to corroborate his argument that he was threatened or improperly coerced. He was also told—several times—that he was free to go, but he chose not to leave. Instead, he kept talking and eventually confessed to murdering his wife. It was only after that confession that he was placed into custody and arrested.

### IV. *Conclusion*

For the reasons set forth herein, we affirm the defendant's conviction and sentence.

Affirmed.

---

of custody and interrogation is crucial for the attachment of *Miranda* rights. See *Miranda v. Arizona* [384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)].
*Bradshaw*, 193 W.Va. at 530, 457 S.E.2d at 467.

3. *See* Syllabus Point 1 of *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006), *overruled on other grounds by State v. Eilola*, 226 W.Va. 698, 704 S.E.2d 698 (2010), where we explained that
A trial court's determination of whether a custodial interrogation environment exists for purposes of giving *Miranda* warnings to a suspect is based upon whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest.

In Syllabus Point 2 of *Middleton* we described some of the factors that should be considered when making a determination of whether a custodial environment exists:
The factors to be considered by the trial court in making a determination of whether a custodial interrogation environment exists, while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest.