478 S.E.2d 742

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Larry POTTER, Defendant Below, Appellant.**

No. 23406.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1996.

Decided Oct. 11, 1996.

counts of first degree sexual assault and three counts of sexual abuse by a custodian. He also appeals a final order of the Circuit Court of Morgan County, dated August 14, 1995, sentencing him to three sentences of not less than fifteen years nor more than thirty-five years for three counts of first degree sexual assault and three sentences of not less than five years nor more than fifteen years for three counts of sexual abuse by a custodian. The circuit court ordered the three first degree sexual assault sentences to run consecutive to each other, and the three sexual abuse by a custodian sentences to run concurrent with the respective sexual assault sentences to which they relate.

On appeal to this Court, the defendant asserts the circuit court erred by: (1) admitting into evidence the defendant's confession where the interrogating police officer continued his interrogation after the defendant allegedly invoked his right to counsel; (2) permitting the Reverend Martin Rudolph to testify in violation of W. Va.Code, 57–3–9 (1992), the clergy-communicant privilege; and (3) allowing the State to elicit, on cross-examination, evidence regarding the defendant's religious beliefs. Upon a review of the record, we find no reversible error and affirm the decision of the circuit court.

## I.

### FACTUAL AND PROCEDURAL HISTORY.

In 1991, seven-year-old Joshua H.,[1] his two sisters, and his parents began attending the Paw Paw Bible Church in Paw Paw, West Virginia, after Joshua's mother, Tammy H., had received counseling from the church's pastor, Larry Potter. Mr. Potter and his wife soon became friends with Joshua's family, and the two families often visited in each other's homes and had dinner together.

Mr. Potter also befriended Joshua and one of his sisters, taking them places and inviting them to spend the night at the apartment Mr. Potter shared with his wife. After a

Dawn E. Warfield, Deputy Attorney General, Charleston, for Appellee.

Deborah Lawson, Public Defender, Martinsburg, for Appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, Larry Potter, appeals a jury verdict entered June 1, 1995, by the Circuit Court of Morgan County, which found him guilty of three

---

1. We follow our traditional practice in cases involving sensitive facts and do not use the last names of the parties in order to protect their identities. *See, e.g., State v. George W.H.,* 190 W.Va. 558, 439 S.E.2d 423 (1993); *State ex rel. Div. of Human Serv. by Mary C.M. v. Benjamin P.B.,* 183 W.Va. 220, 395 S.E.2d 220 (1990).

period of time, Mr. Potter began inviting only Joshua to spend the night. These overnight visits progressed from one night per week to approximately two nights per week. During these visits, Joshua slept on a mattress on the Potters' basement floor. Joshua told his mother that Mr. Potter often slept on the mattress with him and engaged in anal intercourse with him on at least three or four occasions. Joshua also indicated he was afraid to report this abuse earlier because Mr. Potter allegedly told him he would regret revealing this information.

Tammy H. reported the allegations of sexual abuse to the Morgan County Sheriff's Department in the fall of 1993. In October, 1993, Morgan County Chief Deputy John Ketterman began an investigation of Mr. Potter because the Sheriff's Department had received numerous reports alleging that Mr. Potter had sexually abused several young boys, including Joshua. After interviewing Joshua, Deputy Ketterman asked Mr. Potter to meet with him at the Morgan County Sheriff's Office; Deputy Ketterman desired to speak with Mr. Potter to inform him of the numerous allegations and the possible upcoming charges of sexual abuse.

On October 27, 1993, Mr. Potter went to the Sheriff's Office to speak with Deputy Ketterman. It seems Deputy Ketterman informed Mr. Potter of the sexual abuse allegations, reiterated the severity of the charges, and suggested that he leave the police station without speaking further to Deputy Ketterman.[2] Apparently, Mr. Potter then indicated he wanted to speak to Ketterman because he "had some things that he wanted to get off of his chest." At that point, Deputy Ketterman left the interrogation room to obtain a tape recorder so he could record Mr. Potter's statement.[3]

Upon returning to the interrogation room, Deputy Ketterman read Mr. Potter his *Miranda* rights[4] and obtained a signed waiver of these rights, including Mr. Potter's right to counsel. Deputy Ketterman then reiterated Mr. Potter's right to have an attorney present before proceeding with questioning and asked Mr. Potter whether he understood his rights.[5] Following this exchange, Mr.

2. Mr. Potter claimed that, when he met with Deputy Ketterman, the deputy was holding papers in his hand and informed Mr. Potter that he had warrants for his arrest; Mr. Potter believed these papers to be the arrest warrants to which Deputy Ketterman referred. The circuit court found Deputy Ketterman's account of the meeting to be more credible where the parties' statements and/or actions were in dispute.

3. Deputy Ketterman testified he informed Mr. Potter he was not under arrest, and he further advised Mr. Potter to leave the police station because he no longer wanted Mr. Potter to speak with him about these serious allegations.

4. In *Miranda v. Arizona*, 384 U.S. 436, 444–45, 478–79, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706–07, 726 (1966), the United States Supreme Court held that law enforcement officers must inform suspects of the privilege against self-incrimination prior to initiating custodial interrogation. The Supreme Court announced that a suspect

"must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

5. Before questioning Mr. Potter, Deputy Ketterman reminded him of his rights, including the right to counsel:

"Ketterman: Advising Mr. Potter of his rights and he has signed [*sic*] consent statement that he will answer questions.
"Ketterman: Before we ask you any questions you must understand what your rights are. You have the right to remain silent, anything you say can be used against you in court, you have the right to talk to an [*sic*] lawyer for advise [*sic*] before questioning and have him with you during questioning. If you cannot afford a lawyer and want a lawyer one will be provided for you. If you decide to answer questions now without a lawyer present you still have the right to stop answering at any time. You also have the right to stop answering at any time till you talk to a lawyer.
"Ketterman: Do you understand you [*sic*] rights Mr. Potter?
"Ketterman: Speak up sir.
"Potter: Yes.
"Ketterman: Okay, you do consent to talk to me?
"Potter: Yes.
"Ketterman: Okay, without the presence of an attorney?
"Potter: Yes.
"Ketterman: Okay, now I have advised you that you possibly need an attorney here and you do need one I believe.

Potter admitted to sexually assaulting Joshua by way of three or four incidents of anal intercourse. After Mr. Potter completed his statement, Deputy Ketterman informed him that he could either wait while the secretary typed the statement and read and sign it that day, or he could return the next day to read and sign the statement. Mr. Potter remained at the Sheriff's Office while the statement was prepared.

The next day, a warrant was obtained for Mr. Potter's arrest. Following his arrest, Mr. Potter was held in the Eastern Regional Jail in Martinsburg, West Virginia. On November 2, 1993, Mr. Potter received a visit from the Reverend Martin Rudolph, Minister of the Woodrow Union Church in Paw Paw, West Virginia. Reverend Rudolph comforted and consoled Mr. Potter, and the two men prayed together. It appears that Mr. Potter also discussed with Reverend Rudolph the sexual assault allegations and Mr. Potter's involvement in those episodes. It is unclear whether Mr. Potter believed this conversation to be private and confidential or whether he gave Reverend Rudolph permission to disclose this information in order to help others. Mr. Potter was subsequently released from the Eastern Regional Jail and placed on home detention.

On January 11, 1994, a Morgan County grand jury returned an indictment charging [6] Mr. Potter with five counts of first degree sexual assault in violation of W. Va.Code, 61–8B–3 (1991),[7] and five counts of sexual abuse by a custodian, in violation of W. Va.Code, 61–8D–5 (1991).[8] Suppression hearings were held in this case with regard to the defendant's motion to suppress the statement he gave to Deputy Ketterman. Mr. Potter asserted that he invoked his right to counsel and that Deputy Ketterman continued his interrogation despite the defendant's request for an appointed attorney. By order dated May 5, 1995, the circuit court denied the

"Potter: I can't afford one.

"Ketterman: Well, if you can't afford one, one will be provided for you.

"Potter: Okay.

"Ketterman: What do you say about some of the allegations [sic] made against you and questions I wanna [sic] ask you are incidents that happened between you and some of the young boys at church. Now in your own words I want you to tell me who the kids were and the particular incidents, I need to know those particular incidents, obviously those children have to be treated. They have to go through some psychological gonna [sic] have psychological problems if we dont' [sic]. Which children are we talking about?

"Potter: Joshua H[.]...."

Deputy Ketterman then proceeded to take Mr. Potter's statement.

6. This indictment pertains only to the allegations of Mr. Potter's sexual assault of Joshua. The record indicates Mr. Potter also was indicted with regard to allegations of sexual assault involving at least one other victim; the present status of these additional charges is unknown.

7. The crime of sexual assault in the first degree is defined in W. Va.Code, 61–8B–3 (1991), in part, as:

"(a) A person is guilty of sexual assault in the first degree when:

\* \* \* \* \* \*

"(2) Such person, being fourteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is eleven years old or less.

"(b) Any person who violates the provisions of this section shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than fifteen nor more than thirty-five years, or fined not less than one thousand dollars nor more than ten thousand dollars and imprisoned in the penitentiary not less than fifteen nor more than thirty-five years."

8. W. Va.Code, 61–8D–5 (1991), defines the crime of sexual abuse by a custodian as follows:

"(a) In addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows: If any parent, guardian or custodian of a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then such guardian or custodian shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than five nor more than fifteen years, or fined not less than five hundred nor more than five thousand dollars and imprisoned in the penitentiary not less than five years nor more than fifteen years[.]"

defendant's motion to suppress and ruled, as it had during the April 7, 1995, suppression hearing, that the defendant did not invoke his right to counsel and that Deputy Ketterman did not improperly interrogate him in violation of his right to counsel.

The defendant stood trial, by jury, for these charges in Morgan County on April 17, 1995. During the trial, the State introduced the defendant's statement that he gave to Deputy Ketterman in October of 1993. Counsel for the defendant raised an objection to this evidence, claiming the statement was impermissibly obtained after the defendant invoked his right to counsel [9]; the trial court overruled this objection on the basis of its earlier ruling that such statement would be admissible. In addition, the defendant testified as to his religious background and prior profession as a pastor. Upon cross-examination, the State inquired as to the defendant's religious beliefs and whether he believed that his actions toward Joshua constituted a sin for which he had received forgiveness from God. Defense counsel objected to the State's inquiry arguing that evidence of the defendant's religious beliefs was irrelevant and inflammatory.[10] The trial court overruled the defendant's objection and permitted the State's line of questioning. Finally, the trial court permitted Reverend Rudolph to testify regarding his visit with the defendant in the Eastern Regional Jail. The defendant's attorney objected to this evidence asserting that it violated the clergy-communicant privilege.[11]

On April 20, 1995, the jury returned a verdict finding the defendant guilty of three counts of first degree sexual assault, one count of first degree sexual abuse, and four counts of sexual abuse by a custodian.[12] During the sentencing hearing in this matter, the trial court set aside the defendant's convictions on Count Seven (first degree sexual abuse) and Count Eight (sexual abuse by a custodian) of the indictment finding the evidence at trial did not establish the defendant had committed more than three incidents of sexual assault and sexual abuse by a custodian with regard to Joshua. The trial court also denied the defendant's motion to reconsider evidence, ruling that the evidence did not warrant reconsideration, and the defendant's motion for an arrest of judgment and for a new trial.

By order dated August 14, 1995, the trial court sentenced the defendant to three sentences of not less than fifteen years nor more than thirty-five years for three counts of first degree sexual assault and three sentences of not less than five years nor more than fifteen years for three counts of sexual abuse by a custodian. The trial court ordered the three first degree sexual assault sentences to run consecutive to each other, and the three sexual abuse by a custodian sentences to run concurrent with the respective sexual assault sentences to which they relate. Lastly, the trial court continued the defendant on home confinement pending his appeal to this Court.

## II.

### DISCUSSION

On appeal to this Court, the defendant asserts the trial court erred by: (1) admitting into evidence the defendant's confession where the interrogating police officer continued his interrogation after the defendant allegedly invoked his right to counsel; (2) permitting Reverend Rudolph to testify in violation of W. Va.Code, 57–3–9 (1992), the

9. Upon admission of the defendant's statement, defense counsel requested the trial court to consider as continuing all his prior objections voiced during the suppression hearings and pretrial conference as to the admissibility of this evidence.

10. Defense counsel objected and cited Rule 610 of the West Virginia Rules of Evidence, which provides: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' [sic] credibility is impaired or enhanced."

11. The clergy-communicant privilege is located in W. Va.Code, 57–3–9 (1992), the relevant portion of which is set forth in Section II(B), infra. With regard to Reverend Rudolph's trial testimony, defense counsel renewed his earlier objection to this evidence.

12. The circuit court dismissed Count Nine of the indictment, charging first degree sexual assault, and Count Ten, charging sexual abuse by a custodian, ruling the evidence did not support a finding that more than four such incidents occurred.

clergy-communicant privilege; and (3) allowing the State to elicit, on cross-examination, evidence regarding the defendant's religious beliefs.[13]

## A.

### Voluntariness of Confession

■ We first address the defendant's assertion that the trial court improperly admitted into evidence the statement he gave to Deputy Ketterman on October 27, 1993.[14] Specifically, the defendant contends that the admission into evidence of his confession violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 444–45, 478–79, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706–07, 726 (1966),[15] in that his right to counsel during the interrogation was not scrupulously honored.

Following hearings on the defendant's motion to suppress this statement, the trial court, by order entered May 5, 1995, denied the defendant's motion and found:

> "[T]he statement given by the Defendant to Morgan County Chief Deputy Sheriff John Ketterman on October 27, 1993, (a recording of which statement was made by audiotape together with a transcription thereof, as are contained in the record) was made voluntarily and ... the Defendant knowingly, intelligently, and freely waived both his right to have counsel present at the time of the statement and his rights under Miranda, including the right to remain silent and the right to have counsel appointed for him, and ... the Defendant did thereupon willingly consent to talk to the officer and provide him with the aforesaid statement."

During the trial, the trial court noted the defendant's continuing objection to the admission of this statement. As reflected above, the trial court entered written findings that the confession was in all respects voluntary and that the defendant was properly warned. The trial court found, *inter alia*, that the warnings as testified to were given to the defendant; that he never advised the officer that he wanted an attorney present; and that the defendant, after repeated warnings, knowingly, intelligently, and voluntarily waived his *Miranda* rights, including his right to counsel.

■ Where the question on appeal is whether a confession admitted at trial was voluntary and in compliance with *Miranda* with respect to issues of underlying or historic facts, a trial court's findings, if supported in the record, are entitled to this Court's deference. However, there is an independent appellate determination of the ultimate question as to whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of *Miranda* and the United States and West Virginia Constitutions. *See Miller v. Fenton*, 474 U.S. 104, 110–14, 116–18, 106 S.Ct. 445, 449–52, 453, 88 L.Ed.2d 405, 411–13, 415–16 (1985). Indeed, recognizing the importance of determining whether a defendant's confession is, in fact, voluntary and therefore admissible, we have explicitly delineated this Court's responsibility in this inquiry in Syllabus Point 2 of *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994):

> "This Court is constitutionally obligated to give plenary, independent, and *de novo*

---

**13.** Although the defendant raised additional issues in his petition for appeal, we refuse to address those issues because he did not reassert them in his final brief before this Court. This ruling is consistent with our prior practice. *See* Syl. Pt. 6, *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981) ("[a]ssignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived"). *See also* Syl. Pt. 9, *State v. Garrett*, 195 W.Va. 630, 466 S.E.2d 481 (1995); Syl. Pt. 1, *State v. Schoolcraft*, 183 W.Va. 579, 396 S.E.2d 760 (1990).

**14.** This statement contains an admission by the defendant that he sexually assaulted Joshua:

> "Ketterman: Did you do any sex acts on him?
> "Potter: Yes sir.
> "Ketterman: What was that?
> "Potter: Intercourse.
> "Ketterman: Intercourse, anal intercourse?
> "Potter: [No response.]
> "Ketterman: Okay, how many times did you do this?
> "Potter: Just a couple, 3 or 4[.]"

**15.** The full text of the *Miranda* warnings is set forth in note 4, *supra*.

review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions."

In the proceedings below, the trial court determined the defendant did not invoke his right to counsel. Addressing the defendant's arguments, the trial court ruled:

"Mr. Potter suggested he requested an attorney prior to answering questions. The only credible evidence that the Court could find here that could possibly be construed as such a request was his quote/unquote okay response at the beginning of the recorded statement. Such a response was ambiguous, at best.

"Given the defendant's insistence that he make a statement, even in the face of a policeman's advice that he needed counseling, the Court has no problem with the officer's interpretation of such statement as not indicating a desire to have counsel before being questioned by Ketterman."

■ Before this Court, the defendant maintains Deputy Ketterman improperly continued his interrogation after the defendant invoked his Sixth Amendment right to counsel.[16] In this regard, the defendant contends his response of "okay" to Deputy Ketterman's statement that an attorney would be provided for the defendant if he could not afford counsel[17] constituted an affirmative invocation of his right to counsel. Once the

defendant made this clear and unambiguous request for counsel, he asserts the holding of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), required Deputy Ketterman to cease the interrogation. In *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386, the United States Supreme Court held: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (Footnote omitted). Thus, the defendant argues that even if he continued to respond to Deputy Ketterman's inquiry, *Edwards* indicates his further responses did not constitute a waiver of his right to counsel.

The State argues the defendant failed to make a clear and unambiguous request for an attorney. In this manner, the State notes that Deputy Ketterman informed the defendant of his right to counsel; that the defendant signed a waiver of his right to counsel; and that Deputy Ketterman reiterated the defendant's right to counsel, asking the defendant if he understood his rights. Despite these warnings, the defendant never expressly told Deputy Ketterman that he wanted to speak with an attorney. Because it is unclear whether the defendant's "okay" response was merely an affirmation that he understood that counsel would be appointed for him or whether "okay" indicated the defendant's intention to invoke his right to counsel, the State urges the ambiguity be resolved in favor of the interrogating police

---

**16.** The Sixth Amendment to the United States Constitution provides:

"*In all criminal prosecutions, the accused shall enjoy the right* to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and *to have the Assistance of Counsel for his defence.*" (Emphasis added). The defendant's reliance on the Sixth Amendment is misplaced. The Sixth Amendment is not implicated in custodial interrogation unless crim-

inal charges have already been filed. In *State v. Bradshaw*, 193 W.Va. 519, 526 n. 2, 457 S.E.2d 456, 463 n. 2, *cert. denied*, — U.S. —, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995), we stated that "we find the Sixth Amendment to be inapplicable to this situation in that the interrogation did not occur 'at or after the initiation of adversary judicial criminal proceedings[.]' *See Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972). *Miranda* warnings, protective of Fifth Amendment interests, are the rights the defendant seeks to vindicate."

**17.** For the full text of the exchange between Deputy Ketterman and the defendant concerning the defendant's right to counsel, see note 5, *supra.*

officer. "[I]nsubstantial and trivial doubt, reasonably caused by the defendant's ambiguous statements as to whether he wants the interrogation to end, should be resolved in favor of the police and ... under these circumstances further interrogation by the police does not offend the West Virginia Constitution." *State v. Farley*, 192 W.Va. at 256, 452 S.E.2d at 59, *citing Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Therefore, the State contends the trial court properly found the defendant did not invoke his right to counsel.

■ The record fairly supports the underlying factual determinations of the trial court that the defendant did not invoke his right to counsel. Before the defendant confessed, he signed a waiver form wherein the *Miranda* warnings were stated at the top and were followed by a statement that the signer had read, understood, and voluntarily waived those rights. We find the trial court properly determined the defendant's response was insufficient to invoke his right to counsel. Although Deputy Ketterman made the right to counsel sufficiently clear to the defendant, the defendant did not, in any manner, affirmatively assert his right to an attorney. We hold that a defendant, in order to assert his or her right to counsel during a police interrogation, must make some affirmative indication that he or she desires to speak with an attorney or wishes to have counsel appointed. Absent such an affirmative showing by the defendant, the right to counsel will be deemed waived.[18]

■ We likewise reject the defendant's claim that he was in custody at the time of the interrogation. The trial court found the defendant's confession to Deputy Ketterman was voluntary and was not the result of custodial interrogation. The trial court rejected the defendant's contentions that his statement was involuntary noting: "Mr. Pot-

ter had decided well in advance that he had to clear his conscience.... It is the opinion of this Court that the defendant's statement was actuated not by some improper activity on the part of the police, but rather by the defendant's own conscience."

The defendant maintains his statement was inadmissible because it was the product of a custodial interrogation. He states that, when he arrived at the police station to meet with Deputy Ketterman, he believed the deputy had warrants for his arrest and he was not free to leave.[19] Therefore, although the defendant voluntarily went to the police station to meet with Deputy Ketterman, the deputy's actions turned the innocuous investigatory investigation into an accusatory custodial interrogation. In support of this argument, the defendant cites Syllabus Point 1 of *State v. Jones*, 193 W.Va. 378, 456 S.E.2d 459 (1995):

> " 'Where police, lacking probable cause to arrest, ask suspects to accompany them to police headquarters and then interrogate them ... during which time they are not free to leave or their liberty is restrained, the police have violated the Fourth Amendment.' Syllabus Point 1, in part, *State v. Stanley*, 168 W.Va. 294, 284 S.E.2d 367 (1981)."

*See also* Syl. Pt. 2, in part, *State v. Mays*, 172 W.Va. 486, 307 S.E.2d 655 (1983) (holding limited investigatory inquiries to be permissible where the investigating police officer informs the subject that "he is not under arrest, is not obligated to answer questions and is free to go").

The State responds that the defendant's statement is admissible because the defendant was not in custody, and he freely and voluntarily spoke with Deputy Ketterman. Upon being warned by Deputy Ketterman of the severity of the charges against him and

---

**18.** We previously noted in Syllabus Point 3 of *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980): "Where the defendant is equivocal in whether he desires to exercise his constitutional right to counsel, further questions may be asked in order to clarify his position." In this case, we find from the defendant's actions in voluntarily speaking with Deputy Ketterman and his responses to the deputy's statements that the defendant unequivocally waived his right to counsel.

Thus, we decline to address further the instances in which clarifying questions would be appropriate.

**19.** The trial court found incredible the defendant's account of October 27, 1993, when the defendant's recollection of that day's events conflicted with that of Deputy Ketterman.

counseled not to speak further about these charges, the defendant stated he wanted to speak because he "wanted to get something off his chest." Prior to obtaining the defendant's confession, Deputy Ketterman read the defendant his *Miranda* rights, obtained a written waiver of those rights, and reiterated the rights immediately before beginning the interrogation. Thus, the State maintains the defendant was not in custody, and he voluntarily gave the statement at issue. We agree with the State.[20]

■ Of course, if the defendant was not in custody at the time of the interrogation, he would not be able to take advantage of a violation of his *Miranda* rights. In *State v. Bradshaw*, 193 W.Va. 519, 530, 457 S.E.2d 456, 467, *cert. denied*, — U.S. —, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995), we stated:

"[T]he *Miranda* right to counsel has no applicability outside the context of custodial interrogation. Therefore, until the defendant [has been] taken into custody, any effort on his part to invoke his *Miranda* rights [is], legally speaking, an empty gesture. We believe the 'window of opportunity' for the assertion of *Miranda* rights comes into existence only when that right is available." (Footnote omitted).

Thus, *Miranda* rights must be given and honored "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam).

■ Whether the defendant was "in custody" is determined by an objective test: viewing the totality of circumstances, would a reasonable person in the defendant's position have considered his freedom of action restricted to the degree associated with a formal arrest. *See Thompson v. Keohane*, 516 U.S. —, — & n. 13, 116 S.Ct. 457, 465–66 & n. 13, 133 L.Ed.2d 383, 394–95 & n. 13 (1995); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983) (per curiam); *State v. Hopkins*,

192 W.Va. 483, 453 S.E.2d 317 (1994). *See also State v. Honaker*, 193 W.Va. 51, 60–61, 454 S.E.2d 96, 105–06 (1994) (applying "objective circumstances" test to determine whether the defendant was in custody); Syl. Pt. 3, in part, *State v. Preece*, 181 W.Va. 633, 383 S.E.2d 815 (1989) ("[t]he sole issue before a trial court in determining whether [an] investigation has escalated into an accusatory, custodial environment, requiring *Miranda* warnings, is whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest"). That the questioning took place in a police station is relevant but not controlling. *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719; *State v. Honaker*, 193 W.Va. at 61, 454 S.E.2d at 106. Moreover, the subjective *undisclosed* beliefs of the defendant and the questioning officer regarding custody are irrelevant. *See Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994) (per curiam). Both *Thompson*, 516 U.S. at —, 116 S.Ct. at 466–67, 133 L.Ed.2d at 395–96, and *Farley, supra*, require us to apply *de novo* this objective test to the facts found by the trial court.

■ Reviewing the record in this case, we find the trial court correctly concluded the defendant's statement was voluntary. Consistent with our ruling in Syllabus Point 3 of *State v. Preece, supra*, we must consider "whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest." We find that no reasonable person in the defendant's position would have considered his or her freedom to have been curtailed. The defendant, at the request of Deputy Ketterman, voluntarily went to the Sheriff's Office to speak with the deputy. After informing the defendant of the sexual assault and sexual abuse allegations, Deputy Ketterman specifically advised the defendant to leave, without speaking further, due to the severity of the

---

**20.** In the alternative, the State replies that even if the defendant was in custody, his confession is admissible because he knowingly and voluntarily waived his rights. *See State v. Wyant*, 174 W.Va. 567, 328 S.E.2d 174 (1985) (per curiam) (holding the defendant's statement to be admissible where he voluntarily accompanied police for questioning, was advised that he was free to leave, and indicated his desire to remain and cooperate with the investigation).

allegations. The defendant then stated that he wished to give a statement and willingly remained at the police station until his confession had been transcribed. Accordingly, we hold, in a situation such as this, when a suspect willingly goes to the police station for questioning at the request of the investigating officer, and the suspect responds that he or she wishes to give a statement despite the officer's warnings regarding the severity of the allegations against the suspect, such statement is admissible as a voluntary confession, unless the suspect can show that he or she was in custody or that the statement was not voluntary.

█ In this case, it is clear that the defendant tendered a voluntary confession. Despite Deputy Ketterman's warnings to leave and speak no further of the allegations, the defendant remained at the police station and stated that he desired to give a statement. True, the interview was designed to elicit incriminating responses if the defendant was guilty, but he was free to leave at all times prior to his confession. In fact, he was permitted to leave even after he gave the incriminating statement. The circumstances surrounding the defendant's statement suggest neither that he was in a custodial environment nor that his confession was not voluntary. In fact, he was treated with consideration due one who has volunteered to be interviewed, the kind of latitude that is clearly inconsistent with custodial interrogation. Given these circumstances, we have no hesitancy to conclude that the defendant was not in custody at the time of the interrogation. Thus, we find the trial court properly admitted the defendant's statement into evidence.

## B.

### Clergy–Communicant Privilege

█ The defendant also assigns as error the trial court's admission of testimony allegedly violating the clergy-communicant privilege. During the suppression hearings in this matter, the Reverend Martin Rudolph testified that he visited the defendant, who was, at that time, confined in the Eastern

Regional Jail. Reverend Rudolph related that he and the defendant spoke about the allegations that the defendant had sexually assaulted and/or abused male children who attended the defendant's church. While speaking of these charges, the defendant allegedly stated that "he knew what was happening was wrong, [but he] couldn't quit." The Reverend also reported that the defendant gave him permission to "use [their conversation in] any way that [the Reverend thought] it would be helpful" to others.

With regard to his conversation with Reverend Rudolph, the defendant testified that he believed that "what I talked to [the Reverend] about would be between us." The defendant further admitted that he had never before sought spiritual guidance or forgiveness from Reverend Rudolph and that he, the defendant, did not "confess[ ] to [the Reverend], as a communicant confesses to a priest when [he] talked to [the Reverend] that day." Lastly, the defendant conceded that he could not remember whether he gave Reverend Rudolph permission to disclose their conversation to others, but that he may have granted such permission.

The circuit court found:

"[A]s a matter of fact, that Reverend Rudolph's professional capacity, with reference to his church, which does not have a course discipline required of it, that this was not a type of confessional and therefore that this conversation between these two people does not come within [sic] purview of 5739 [sic], and therefore is not prohibited by that statutory section." [21]

On appeal, the defendant argues that his conversation with Reverend Rudolph is protected by the clergy-communicant privilege contained in W. Va.Code, 57–3–9 (1992). The defendant asserts that Reverend Rudolph is, in fact, a member of the clergy within the scope of this statute and that he spoke with the defendant in his professional capacity as a minister. Furthermore, the defendant believed the Reverend visited him for the sole purpose of providing comfort and strength during his confinement. Finally, the defendant, who holds this privilege, asserts that

**21.** The court noted the defendant's objection to this ruling.

because he has not waived this privilege, the Reverend cannot reveal the contents of their conversation.

The State replies that the trial court did not abuse its discretion by admitting into evidence Reverend Rudolph's testimony as to his conversation with the defendant because the defendant has not satisfied the statutory elements of the clergy-communicant privilege. Although the Reverend is a member of the clergy, the defendant has failed to show that he spoke with the Reverend in his role as a professional counselor. In fact, the defendant admitted that he did not attend the Reverend's church and that he had never before confided in him as a pastor. More importantly, the State contends that the defendant expressly waived this privilege by granting permission for the Reverend to use the information in "any way that [the Reverend thought] it would be helpful" to others.

■ To the extent the trial court's admission of evidence was based upon an interpretation of a statute or West Virginia Rule of Evidence, our standard of review is plenary. *State v. Omechinski*, 196 W.Va. 41, 45, 468 S.E.2d 173, 177 (1996); *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995). Our review of a trial court's ruling to admit or exclude evidence if premised on a permissible view of the law, however, is only for an abuse of discretion. *Id.* Although we do not agree entirely with the trial court's interpretation of the coverage of W. Va.Code, 57–3–9 (1992), in this instance, we do not find the trial court abused its discretion in ruling that the conversation between the defendant and Reverend Rudolph was admissible and not subject to the clergy-communicant privilege provided by the statute.

The question of the sacredness of confessions made to a priest has frequently been a matter of judicial consideration. In general, the "confessional seal," now referred to as the priest-penitent or clergyman-communicant privilege, has been recognized in many jurisdictions, although the privilege has no firm foundation in common law. *See* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 5–4(F)(2) at 583 (3rd ed.1994); 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2394

(John T. McNaughton rev.1961). The rationale in support of such a privilege seems to be the demands of religious liberty, the need for individuals to be able to disclose "sinful" acts to a spiritual counselor, and the desire to avoid confrontation with clergy who refuse to divulge communications they feel ethically and religiously obligated to keep secret. *See* Seward Reese, *Confidential Communications to the Clergy*, 24 Ohio St. L.J. 55 (1963).

■ In West Virginia, the privilege in modern practice traces its existence to a West Virginia statute. W. Va.Code, 57–3–9 (1992), provides a privilege for communications between a clergy and a communicant:

"No priest, nun, rabbi, duly accredited Christian Science practitioner or member of the clergy authorized to celebrate the rites of marriage in this state pursuant to the provisions of article one [§ 48–1–1 et seq.], chapter forty-eight of this code shall be compelled to testify in any criminal or grand jury proceedings or in any domestic relations action in any court of this state:

"(1) With respect to any confession or communication, made to such person, in his or her professional capacity in the course of discipline enjoined by the church or other religious body to which he or she belongs, without the consent of the person making such confession or communication[.]"

Under West Virginia law, the privilege is designed to safeguard the clergy status as a secure depository for the confessant's confidences. As with most clergy-communicant statutes, the West Virginia statute prohibits the clergyman from disclosing the contents of a confidential communication without the consent of the person making the communication. Thus, we conclude that the communicant is at least one of the holders and owners of the privilege. *Cf. Seidman v. Fishburne-Hudgins Educ. Found., Inc.*, 724 F.2d 413, 415 (4th Cir.1984) (holding that because Virginia statute does not require a clergyman to testify regarding any confidential information revealed to him in his professional, religious capacity "without the consent of the person making such confession," only the clergyman, and not the penitent or lay communicant,

holds the clergy-communicant privilege). Having determined that the defendant could properly assert the privilege, we must now decide whether the defendant met the other circumstances required by statute.

We believe this statutory privilege must receive a construction consistent with its policy to carry out "a long-standing public policy to encourage uninhibited communication between persons standing in a relation of confidence and trust, such as ... confessor and clergyman[.]" *People v. Shapiro*, 308 N.Y. 453, 458, 126 N.E.2d 559, 561–62 (1955). *See also Allen v. Lindeman*, 259 Iowa 1384, 1390–91, 148 N.W.2d 610, 614–15 (1967). In this regard, we agree with the eloquent analysis of the United States Circuit Court of Appeals for the District of Columbia:

> "Sound policy—reason and experience—concedes to religious liberty a rule of evidence that a clergyman shall not disclose on a trial the secrets of a penitent's confidential confession to him, at least absent the penitent's consent. Knowledge so acquired in the performance of a spiritual function as indicated in this case is not transformed into evidence to be given to the whole world.... The benefit of preserving these confidences inviolate overbalances the possible benefit of permitting litigation to prosper at the expense of the tranquility of the home, the integrity of the professional relationship, and the spiritual rehabilitation of a penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment." *Mullen v. United States*, 263 F.2d 275, 280 (D.C.Cir.1958). (Footnote omitted).

Given the importance of the clergy-communicant relationship, we hold that

such a communication will be privileged, in accordance with W. Va.Code, 57–3–9, if four tests are met: (1) the communication must be made to a clergyman; (2) the communication may be in the form of a confidential confession or a communication [22]; (3) the confession or communication must be made to the clergyman in his professional capacity; and (4) the communication must have been made in the course of discipline enjoined by the rules of practice of the clergyman's denomination. The plain language of the statute leads us to conclude that the design of the statute is two-fold. It promotes the desirability of securing unhampered the exercise of the religious duty and discipline of confession, and it protects confidential communications of a communicant made to a clergyman in his or her capacity as clergyman.[23]

Based on the record presented to us, we have no trouble determining that Reverend Rudolph was a clergyman within the contemplation of the statute and that the communication was in the form of a confidential confession at the time the statement was made. We have more trouble making a definitive decision as to whether the confession was made to Reverend Rudolph "in the course of discipline enjoined by the church or other religious body to which he ... belongs." Nowhere in this record do we find evidence demonstrating one way or another that there was a course of discipline enjoined by Reverend Rudolph's church. Fortunately for us, we do not have to make a decision as to this aspect of the privilege on such an inadequate record. Rather, we hold that the defendant later consented to the testimony and therefore waived the confidentiality of the commu-

**22.** Although the term "confession" ordinarily means "a penitential acknowledgment to a clergyman of actual or supposed wrongdoing while seeking religious or spiritual advice, aid, or comfort," *see, In re Swenson*, 183 Minn. 602, 604, 237 N.W. 589, 590 (1931), the term "communication" is not so limited to an admission against the interest of the communicant. If the other prerequisites are met, the fact that the confidential communication is not incriminatory is not relevant.

**23.** It is only where the church of the clergyman requires that the communicant must also belong

or be a member of the clergyman's church that we find such a relationship necessary to invoke the privilege. In *Kohloff v. Bronx Sav. Bank*, 37 Misc.2d 27, 233 N.Y.S.2d 849 (N.Y.Civ.Ct.1962), the court held that a confession to a priest was privileged even though the communicant was not a member of the church, citing *dictum* in the *Swenson* case to the effect that a penitential confession is privileged "though made by a person not a member of the particular church or of any church." *Swenson*, 183 Minn. at 605, 237 N.W. at 591.

nication. There is uncontroverted evidence in the record that shows that the defendant gave Reverend Rudolph permission to "use [their conversation in] any way that [the Reverend thought] it would be helpful" to others. We find this sufficient under the statute to constitute consent.

■ Moreover, any error in the admission of the testimony was harmless. The evidence offered by Reverend Rudolph was merely cumulative and less damaging than the recorded confession of the defendant introduced by the State. Our cases consistently have held that nonconstitutional errors are harmless unless the reviewing court has grave doubt as to whether the erroneously admitted evidence substantially swayed the verdict. See State v. Guthrie, 194 W.Va. 657, 684–85, 461 S.E.2d 163, 190–91 (1995). This standard is the same as the "fair assurance" standard. Id. Therefore, we conclude that even if the testimony of Reverend Rudolph was improperly received, this testimony could not have tainted the verdict in light of the other, more damaging evidence of the defendant's guilt.

## C.

### Evidence of Defendant's Religious Beliefs

■ Lastly, defendant complains that the circuit court impermissibly permitted the State to elicit, on cross-examination, evidence regarding defendant's religious beliefs. On direct examination by defense counsel, the defendant testified as to his prior occupation as pastor of the Paw Paw Bible Church. He also stated that, on two occasions when Joshua was spending the night in

his home, Joshua asked him to show him how to masturbate; using Joshua as an example, the defendant demonstrated this process for him. When asked why he instructed the child in this manner, the defendant replied: "I kind of thought as a pastor to this child, he had asked me the question and I felt that I would be obligated to show him because he didn't understand what he was doing because the other kids were talking about it and he probably wouldn't learn it from somewhere else."

During cross-examination, the State asked the defendant whether he viewed his instruction of Joshua as a sin, based upon the defendant's religious beliefs. Defense counsel objected, and the trial court overruled this objection. The State also inquired as to whether the defendant believed God had forgiven him for his actions, and defense counsel objected. Again, the trial court overruled the defendant's objection. Before this Court, the defendant contends the evidence of his religious beliefs, elicited by the State, was inadmissible.

■ The State maintains the trial court properly admitted evidence of the defendant's religious beliefs because such evidence was relevant to his intent and motive for his actions. The defendant testified, on direct examination, that he had instructed Joshua in conjunction with his role as the boy's pastor. The State asserts this evidence "opened the door" to the line of questioning allowed on cross-examination. Thus, the State was permitted to ask the defendant to further explain his motive and intent with regard to the underlying charges.[24]

24. In addition, the State relies on the curative admissibility rule. During his direct examination, the defendant raised the issue of his religious beliefs by relating his prior job as a pastor and explaining his actions in terms of his ministerial duties. In Syllabus Point 10 of State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court indicated:

"The curative admissibility rule allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has 'opened the door' by introducing similarly inadmissible evidence on the same point. Under this rule, in order to be entitled as a matter of right to present rebutting evidence on an evidentiary fact: (a) The original evidence must

be inadmissible and prejudicial, (b) the rebuttal evidence was similarly inadmissible, and (c) the rebuttal evidence must be limited to the same evidentiary fact as the original inadmissible evidence."

The State asserts the doctrine of curative admissibility permitted it to introduce evidence of the defendant's religious beliefs because (a) the defendant presented inadmissible and prejudicial evidence using his religious beliefs to justify his actions; (b) the State's rebuttal evidence injecting the defendant's religion into this case is similarly inadmissible; and (c) the State's rebuttal evidence was limited to the religion-based justifications introduced by the defendant.

Technically, it is questionable whether curative admissibility is available to the State. The doc-

The defendant's assignment of error regarding his religious beliefs involves evidentiary rulings rendered by the trial court. Our practice is to review a trial court's rulings regarding the admissibility of evidence under an abuse of discretion standard. We recently explained this standard of review in Syllabus Point 1, in part, of *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995):

> "The West Virginia Rules of Evidence ... allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence ... are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard."

Therefore, we will reverse the trial court's rulings admitting evidence in this case only if we determine the trial court abused its discretion in admitting such evidence.

■ We find the cross-examination was proper. Ordinarily, the scope of cross-examination is limited to facts and circumstances connected with statements elicited on direct examination and those matters affecting credibility. In West Virginia trials, the scope is even broader for parties: "A party may be cross-examined on any matter relevant to any issue in the case, including credibility." W.Va.R.Evid. 611(b)(1). In determining whether the scope of cross-examination has been violated, broad discretion is given to the trial court, and we will not disturb that ruling absent a clear abuse of discretion. *See State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982); *State v. Hankish,* 147 W.Va. 123, 126 S.E.2d 42 (1962). After reviewing the defendant's entire testimony on direct examination, we are unable to say that the State exceeded the scope of proper cross-examination even under the more narrow rule limiting cross-examination. *See* W.Va.R.Evid. 611(b)(2) (narrowing scope of cross-examination for non-party witnesses).

Much of the defendant's testimony on direct was offered to create the impression that he, in his capacity as a religious leader, was teaching the victim how to perform specific sexual acts. Thus, if one characterizes the defendant's direct examination as an attempt to create the impression on the jury that his conduct was religiously motivated and not for his own sexual gratification, the State's inquiry as to the truth or falsity of that impression is not clearly beyond the scope of cross-examination. The defendant's real complaint is that the State achieved its goal so easily, illustrated by the defendant's acknowledgment on cross-examination that his actions were not condoned by his religious beliefs.[25] In this context, questions as

---

trine of curative admissibility allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has "opened the door" by introducing similar inadmissible evidence on the same point. *See generally* 1 John Henry Wigmore, *Evidence in Trials at Common Law* § 15 (Peter Tillers rev.1983) (collecting cases from many jurisdictions). Normally, curative admissibility becomes important only when extrinsic rebuttal evidence is offered. If the contested evidence comes in as a result of cross-examination (intrinsically), its admissibility is determined by the scope of cross-examination. In any event the principles underlying both of these methods are the same.

25. The State cross-examined the defendant, in part, as follows:

"Q. Do you consider yourself thusly to be self-taught in the sexual counseling of youth?

\*  \*  \*  \*  \*  \*

"A. Well, if a boy comes to you and says, asks you about jacking off and he doesn't un-

derstand it, then, I felt it was my obligation to help him to understand that.

\*  \*  \*  \*  \*  \*

"Q. What gave you to understand and what made you believe that you had an obligation to answer this child when he asked you this ... supposedly asked you this question?

"A. Well, it's ... it's like I said, in a profession as a pastor when someone comes to you they [sic] usually are coming to you for answers to maybe a situation or a problem in their [sic] life, so I have to give them [sic] some type of guidance or counsel on that.

"Q. That's what I said. You feel obliged to respond by giving them [sic] guidance, counsel or direction. Is that right?

"A. That's correct.

\*  \*  \*  \*  \*  \*

"Q. Well, it is your statement that what you did with Josh you think is all right, it's unfortunate that all this [publicity] followed behind this but what you did was all right. Is that right?

to whether the defendant's criminal conduct was inconsistent with his religious beliefs constituted proper impeachment directly reflecting on his truthfulness pursuant to Rule 611(b) of the West Virginia Rules of Evidence.

■ The defendant argues further that admitting this testimony was a direct violation of Rule 610 of the West Virginia Rules of Evidence. Rule 610, which is inapposite here, provides: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." Clearly, this rule is intended to prevent jurors from forming an opinion about a witness's general character for truthfulness based on his or her religious beliefs. As Professor Charles McCormick states: "This reason of course is that there is no basis for believing that the lack of faith in God's avenging wrath is today an indication of greater than average untruthfulness." *McCormick On Evidence* § 46 at 171–72 (John William Strong ed., 4th ed.1992). In essence, Rule 610 "simply forecloses such inquiry or evidence as a means to establish the character or disposition of a witness toward truthfulness or untruthfulness." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 6.17 at 548 (1995).

■ If, however, evidence of religion is offered for purposes other than impairing or enhancing a witness's credibility, Rule 610 does not require its exclusion. *See* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–10(C) at 766 (3rd ed.1994) ("[s]uch beliefs, however, may be relevant and admissible on some other grounds, for example, to show that the witness has an interest in the case"). Thus, Rule 610 was never intended to insulate the jury from all information about religious affil-

iations or religious beliefs that may otherwise become relevant in the case.

■ As we have done in the area of Rule 404(b) of the West Virginia Rules of Evidence and liability insurance evidence under Rule 411, we now provide guidance in this area. For religious belief or affiliation evidence to be admissible, the trial court must make the following findings: (1) the evidence of religion is offered for a specific purpose other than to show generally that the witness's credibility is impaired or enhanced; (2) the evidence is relevant for that specific purpose; (3) the trial court makes an on-the-record determination under Rule 403 of the West Virginia Rules of Evidence that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice; and (4) the trial court, if requested, delivers an effective limiting instruction advising the jury of the specific purpose(s) for which the evidence may be used. If these elements are met, we, as an appellate court, will presume that the complaining party was protected from undue prejudice.

In this case, the evidence was offered for the more limited purpose of demonstrating that the defendant was not being truthful regarding his motive for performing sexual acts on the victim. In this situation, the nature of a witness's religious beliefs is not being offered as a *general* basis for believing or disbelieving the witness. Rather the evidence is offered *specifically* to refute the defendant's avowed motive for his conduct that directly bears on his truthfulness as a witness. Thus, we expressly find that the first two factors were met.

■ Although not raised at trial, the defendant contends for the first time on ap-

---

"A. It's not all right what I did [*sic*] and I realize that.

"Q. What was wrong?

"A. By showing him how to masturbate.

"Q. That was wrong?

"A. It was wrong.

"Q. How was it wrong?

"A. Because, in my mind, I felt that I was, you know, making contact with him, with his private areas.

"Q. And, that's wrong by man's law?

"A. No.

"Q. God's law?

"A. I would say it would be a combination of God and your conscience.

"Q. Combination of God's law and your conscience. What do you mean by that?

"A. Well, that means when you do something that's wrong, then your conscience tells you that, but you've got a reinforcement with God that convicts you."

peal that his religious beliefs were inadmissible because such evidence was highly prejudicial and not relevant to the charges against him. *Citing* W.Va.R.Evid. 401 (definition of "relevant evidence"); W.Va.R.Evid. 402 (relevant evidence generally admissible; irrelevant evidence inadmissible); W.Va.R.Evid. 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time). Having scrutinized the testimony, we are persuaded that, as the defendant maintains, it was prejudicial to some degree. But that is not the end of the road. All evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided. *See State v. Peacher,* 167 W.Va. 540, 574–75, 280 S.E.2d 559, 581 (1981); *State v. Rector,* 167 W.Va. 748, 758–59, 280 S.E.2d 597, 603–04 (1981). Thus our inquiry must proceed.

In ruling on the objection that the evidence was unfairly prejudicial, the trial court had to compose a balance between the probative value of the evidence as a whole and the risk of unfair prejudice attendant to keeping it before the jury. Although the evidence was prejudicial in a sense, it was plainly probative to shed light on the direct testimony of the defendant as to his motivation for "helping" the young victim learn to masturbate. In this regard, the defendant asserts that such evidence is inadmissible because he did not contend that his instruction of Joshua constituted a religious rite or practice. On cross-examination of a criminal defendant, however, the prosecution is not limited to the exact words of a defendant but may cross-examine on any fair inferences arising from the direct examination. We find it was proper for the State to attempt to prove that the defendant's pastoral responsibilities were religiously inconsistent with this conduct.

While the question is arguably a close one, we are unprepared to say the evidence's unfairly prejudicial impact substantially outweighed its probative worth. Only rarely, in extraordinary circumstances, will we from a vista of a cold appellate record reverse a trial court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. This is not such an occasion. As a general rule, "[w]hen the defense open[s] up the question ... the prosecution [is] prop-

erly allowed to counteract that evidence ... even if in doing so the evidence offered [makes] the defendant appear as an unsavory character." *Beck v. United States,* 317 F.2d 865, 870 (5th Cir.1963), *cert. denied,* 375 U.S. 972, 84 S.Ct. 480, 11 L.Ed.2d 419 (1964).

Not only is the unfair prejudice claim somewhat attenuated, but, in circumstances such as these, the prejudice can be dissipated by a trial court's firm, carefully worded, and oft-repeated instructions to the jury forbidding it from considering the evidence in violation of the mandates of Rule 610. In this case, no limiting instruction was requested and none was given. The issue of lack of a limiting instruction not being preserved, we find no error.

### III.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the Circuit Court of Morgan County.

Affirmed.